FILED
2010 Mar-30  PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **TERESA R. HOLCOMBE,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CV-08-BE-1674-M** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On September 2, 2005, the claimant, Teresa R. Holcombe, applied for disability insurance benefits under Title II of the Social Security Act. (R. 25.)  The claimant alleges disability commencing on January 31, 2002 consisting of depression, anxiety, deep vain thrombosis, and blood clots in her lungs.  (R. 65.)  The state agency initially denied the claim on November 22, 2005.  (R. 31.)  Consequently, the claimant requested a hearing before an Administrative Law Judge on December 28, 2005, and appeared and testified at a hearing held on April 30, 2007.  (R. 48, 286, 291-302.)  In a decision dated November 21, 2007, the ALJ found that the claimant was not disabled under the Social Security Act, and thus, was ineligible for disability insurance benefits.  (R. 17-24.)  On January 22, 2008, the claimant requested a review of the hearing decision by the Appeals Council.  (R. 9.)  On April 25, 2008, the Appeals Council denied the claimant's request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. 5.)  On July 24, 2008, the Appeals Council granted a sixty day extension for

1

the claimant to file a civil action.  (R. 4.)  The claimant has exhausted all administrative

remedies.  This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the

reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents two issues for review.  The first is whether the ALJ failed to give

proper weight to the opinion of Dr. G. Michael Shehi.  The second is whether the ALJ properly

applied the pain standard in determining that the claimant's statements about the severity of her

symptoms were not supported by objective medical evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g);

*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999

(11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions

including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826

F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*.

The court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A)**,** a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?

> An affirmative answer to steps one, two, and four leads to the next question  On steps three and five, an affirmative answer constitutes a finding of disability  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must accord substantial or considerable weight to the treating physician's opinion unless "good cause" is shown to the contrary. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ may find "good cause" to reject a treating physician's opinion

where the opinion is not bolstered by the evidence, where the evidence supports a contrary finding, or where the opinion is inconsistent with the doctor's own medical records. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *See Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either*

> (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

## V. FACTS

Claimant, Teresa R. Holcombe, was forty-two years old at the time of the administrative hearing and has a high school education. (R. 291, 294.) She has prior work experience as a nursing assistant and sewing machine operator. (R. 295.) Claimant alleges that she has been unable to work because of depression, anxiety, deep vein thrombosis, and blood clot in her lungs since January 31, 2002. (R. 65.)

### Medical History prior to January 31, 2002

The claimant has a family history of depression. (R. 274.) In the early- to mid- 1990s, a physician diagnosed the claimant with depression after she had two miscarriages within a six month period, and prescribed Prozac and Amitriptyline to her for about one year. *Id.*

On April 27, 2001, the claimant began psychiatric treatment for depression at Mountain

View Hospital, a psychiatric and chemical dependency hospital located in Gadsden, Alabama. (R. 274.) The claimant reported that she had felt depression coming on four weeks prior and that it had worsened in the previous two weeks. *Id.* The claimant's initial assessment indicates that the claimant "fel[t] worthless" and had "suicidal ideation, but [without a] plan." *Id.* Additionally, the assessment indicates that the claimant had "missed a lot of work" in the month prior to beginning her treatment. *Id.*

On May 3, 2001, the claimant met with Dr. Mihaela Boran, M.D., a psychiatrist with Mountain View Hospital, who noted that the claimant was distractible and had an impaired psychomotor performance. (R. 272.) Dr. Boran diagnosed the claimant with depressive disorder not otherwise specified (NOS) and panic disorder. (R. 271.) Dr. Boran prescribed psychotropic drugs, including Effexor, and therapy. *Id.* The claimant's Global Assessment of Functioning (GAF) was 45, which indicates serious symptoms, or serious impairment in one of the following: social, occupational, or school functioning. (R. 270.) Dr. Boran also wrote a letter indefinitely excusing the claimant from work. (R. 210.)

In the claimant's first therapy session with Janet Lawson, a Marriage and Family Therapist, on May 18, 2001, Ms. Lawson noted two problems rated as severe. (R. 266.) First, Ms. Lawson noted that the claimant had "issues related to sexual abuse." *Id.* Ms. Lawson noted as a second severe problem the claimant's low self-esteem. *Id.* Dr. Boran wrote a second note indefinitely excusing the claimant from work. (R. 203)

On June 1, 2001, the claimant had a second session with Ms. Lawson. (R. 264.) In her progress notes, Ms. Lawson noted the same two problems, which were now listed as moderate problems. *Id.* However, the claimant reported that she "dreaded returning to work," but

5

"lack[ed] the confidence to pursue another career." *Id.* Dr. Boran noted that the claimant "fel[t] improved, [but] still worrie[d] a lot and [found] the prospect of going back to work . . . very scary." (R. 263.) Dr. Boran again wrote a note excusing the claimant from work indefinitely. (R. 199.)

On June 22, 2001, Dr. Boran noted that the claimant was pleasant and reported improvements in mood, energy, and interest. (R. 262.) The claimant was more involved at church and enjoyed spending time with her family. *Id.* Dr. Boran made no changes to the claimant's medications, which were causing no side effects. *Id.* In her therapy session, Ms. Lawson noted that the claimant's low self-esteem was still a moderate problem. (R. 261.) The claimant reported that she was "very hesitant about pursuing other job opportunities or schooling due to [her] lack of confidence [and] fear of failure." *Id.* Ms. Lawson noted that the claimant had yet to return to work and "dreaded doing so." *Id.* Dr. Boran also wrote a note excusing the claimant from work until July 15, 2001. (R. 198.)

On July 27, 2001, Dr. Boran noted that the claimant was still constantly worried and had infrequent panic attacks, and, for those reasons, was unable to return to work. (R. 260.) Ms. Lawson also noted that the claimant had quit her job, and was considering vocational rehabilitation programs. (R. 259.) Again, Ms. Lawson rated the claimant's low self-esteem as a moderate problem. *Id.* This visit was the last therapy session with Ms. Lawson included in the record.

In October of 2001, Dr. Boran noted no side effects from the Effexor. In December of 2001, Dr. Boran noted that the claimant desired to decrease the dosage of Effexor and that her husband was pressing for medication discontinuation. She was experiencing no suicidal

ideations, delusional ideations, or perceptual disturbances.  Accordingly, the doctor decreased her

dosage of Effexor.  (R. 257).

*Medical History from January 31, 2002 to September 30, 2004*

The claimant continued treatment every two to four months with Dr. Boran throughout

this period.  (R. 237-58.)

On March 1, 2002, Dr. Boran noted that the claimant was not experiencing any suicidal

ideations, delusional ideations, or perceptual disturbances.  (R. 256.)  However, after the decrease

of her Effexor dosage, she experienced a reoccurrence of anxiety symptoms, with overworrying,

so the doctor recommended that she maintain the previous Effexor levels.  *Id.*  Dr. Boran also

noted that she enjoyed working at a high school lunch room.  *Id.*  On May 24, 2002, Dr. Boran

noted that the claimant was well and was not experiencing any side effects of Effexor.  (R. 255.)

On September 20, 2002, Dr. Boran noted that the claimant was doing well and that she was

happy and very involved in her daughter's life, but reported excessive sweating as a possible side

effect of Effexor.  (R. 254.)

On January 14, 2003, Dr. Boran noted that the claimant was maintaining stability and

wanted to discontinue her medication.  (R. 253.)  Dr. Boran decided to gradually taper off the

Effexor, on the condition that the claimant monitor for reoccurrence.  *Id.*  On March 14, 2003,

Dr. Boran noted a reoccurrence of anxiety, depression, poor attention, and concentration in

addition to "some irritability and worry."  (R. 252.)  The doctor decided to resume her

medication at prior levels.  *Id.*

On May 29, 2003, Dr. Boran saw the claimant.  (R. 251.)  The doctor  noted that the

claimant was "doing very well.  Cheerful.  Enjoys time [with] her daughter, active in church,"

and the doctor determined that she should continue her medication  *Id.*

In 2003, the claimant underwent an appendectomy and hysterectomy. (R. 110-119, 122). On October 14, 2003, Dr. Boran noted that the claimant "fe[lt] good" one month after having a hysterectomy for endometrioma, and should continue her Effexor medication.  (R. 251.)

On February 10, 2004, Dr. Boran noted that the claimant felt good and was cheerful, but when the claimant tried to scale back her medication, she felt "edgy."  (R. 248.)  Both the claimant and her husband wanted her to continue her medication.  *Id.*

On February 18, 2004, Dr. Jenkins saw the claimant regarding her hypothyroid condition. (R. 164.)

In August of  2004, Dr. Boran noted that the claimant was "maintaining stability." (R. 247.)  She had no suicidal ideations, although she did experience a "tolerable" amount of "sweating as [a side effect] of Effexor."  *Id.*  At that time, Dr. Boran recommended continuing with the "present management" of the claimant's impairments.  *Id.*

*Medical History since September 30, 2004*

On December 13, 2004, Dr. Boran noted that claimant was stable and continued to do well, and therefore, she would continue with her current medications.  (R. 246).

On February 13, 2005, a CT scan performed at Floyd Medical Center, located in Floyd County, Georgia, revealed "a large amount of pulmonary embolism within the distal right and left main pulmonary arteries with extensive thrombus extending into the lower lobe interpulmonary arteries bilaterally."  (R. 131.)  On February 21, 2005, the claimant saw Dr. Melanie Gardner for follow-up treatment of pulmonary embolism.  (R. 160.)  On March 8, 2005, Dr. Gardner noted that the claimant was "having edema of left lower extremity and . . . pain in

[her] left lower extremity."  (R. 157.)  Additionally, Dr. Gardner noted that the claimant was "sad and tearful and very anxious."  *Id.*  On March 29, 2005, the claimant continued to "have some edema in" her left lower extremities.  (R. 156.)  However, Dr. Gardner's next encounter note does not mention the claimant having edema.  (R. 155.)  Dr. Gardner continued to treat the claimant's pulmonary embolism until September 12, 2005.  (R. 141-53.)

On June 9, 2005, Dr. Boran noted an increase in irritability.  (R. 244.)  On July 12, 2005, the claimant reported "feeling tired[, but] . . . improving," at her pulmonary embolism follow up.  (R. 148.)  On September 2, 2005, Dr. Boran noted "episodes of irritability and moodiness."  (R. 242.)

On November 10, 2005, Dr. Frank Nuckols, M.D., a DDS psychiatrist, determined that he had insufficient evidence to make a medical disposition as to a Psychiatric Review Technique. (R. 218.)  He found that "a medically determinable impairment [was] present," specifically a diagnosis of depression based on 5/3/01 Mountain View Hospital records and a diagnosis of anxiety based on 3/14/03 Mountain View Hospital records, but stated that he had insufficient evidence to rate the severity of those conditions on or before the date last insured.  (R. 218- 230.)

On April 4, 2006, Dr. Boran noted that the claimant "still [had] frustrating physical limitations," and increased the claimant's prescription of Effexor "because of frequent irritability and outbursts."  (R. 239.)  On June 2, 2006, Dr. Boran noted a decrease in irritability.  (R. 238.) On July 31, 2006, the claimant saw Dr. G. Michael Shehi, a psychiatrist who was the head of the clinic at Mountain View Hospital, and reported problems with the Effexor dosage, which Dr. Boran had increased at the claimant's last visit.  (R. 236.)  On September 29, 2006, the claimant reported to Dr. Shehi that she was feeling better since decreasing the dosage of Effexor.  (R.

235.)

In late 2006, Dr. Shehi filled out an undated Medical Source Statement, where he opined that the claimant had marked limitations in fourteen of eighteen areas and that the "claimant's impairment caused limitations that have lasted, or can . . . be expected to last, for twelve months or longer at the level of severity indicated."  (R. 276-77.)  Dr. Shehi also signed as the "treating physician, therapist, or psychologist."  (R. 277.)  In the addendum to the Medical Source Statement, Dr. Shehi wrote that he "do[es] not have enough information to support or refute that [the claimant] would have been disabled, due to a psychiatric illness, prior to Sept[ember] 30, 2004," when Dr. Boran was still treating the claimant.  (R. 278.)  However, in a separate letter dated February 6, 2007, Dr. Shehi wrote that the claimant "ha[d] been receiving treatment at our clinic since May 2001, . . . was given medical excuse from work" because of her "psychiatric condition as well as other medical complications, [and] . . . showed periods of moderate improvement yet anytime during the treatment that [the claimant] attempted to pursue gainful employment or vocational rehabilitation her condition worsened."  (R. 281.)

In a letter dated January 10, 2008, Dr. Stephen Spalding, M.D., a psychiatrist at Mountain View Hospital, wrote that the claimant is "under [his] care for the treatment of bi-polar affective disorder."  (R. 10.)

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ.  (R. 48.)  The ALJ received the claimant's medical files into the record, Exhibits 1A through 10F.  (R. 289.)

The claimant first testified that she was born February 22, 1965, was a high school

10

graduate, and lived for the past six or seven years in a single story home with her husband and

daughter, who was a senior in high school at the time of the hearing.  (R. 291-92.).  The claimant

also testified that she had a current and valid driver's license, owned a car that she could drive,

and occasionally did drive herself places.  *Id.*

The claimant testified that she worked about fifteen years ago in a nursing home for two

or three years as a certified nursing assistant but had allowed that certification to lapse.  (R. 295-

96.   The claimant also worked at American Apparel in Centre, Alabama for three years sewing

on industrial machines, but quit working there in early 2000 because of her mental illness.  (R.

296-97.)

The claimant also testified that she was hospitalized for six or seven days at Floyd

Medical Center when she had a pulmonary embolism, and she returned to the emergency room at

Floyd when she had edema in her leg.  (R. 297-98.)  She testified that she has had three doctors at

Mountain View Hospital's behavioral clinic:  Dr. Boran, Dr. Shehi, and Dr. Spaulding.  (R. 298.)

Dr. Boran was her original treating psychiatrist, but left.  *Id.*  Then she saw Dr. Shehi, who was

head of the clinic,  for an interim period until Dr. Spaulding became her regular psychiatrist.  *Id.*

While the ALJ questioned the claimant regarding her doctors, the claimant's attorney interjected

that Dr. Boran had moved out of state, and that he and his client  had been unable to contact Dr.

Boran.  (R. 299.)

The claimant testified that she is unable to work primarily because she has "depression,

anxiety, [and] social phobia," and that she "do[esn't] like large crowds."  (R. 300.) Being around

people causes her anxiety and makes her "want to run away and hide in the closet."  *Id.*  She

rarely leaves home except to see family members or run errands with family members.  When she

does go out by herself, the trip usually involves drive through service, such as refilling medication.  (R. 301).  Additionally, she testified that because of her embolism, she cannot stand for long periods of time and she tires easily.  (R. 300-01.)

The claimant testified that she has sought treatment at Mountain View Hospital since early 2000, and that the doctors have "diagnosed [her] with depression and social anxiety," but have been unable to cure her.  *Id.*  Medications help maintain the *status quo.*   The claimant also testified that she felt that she was disabled before the date she was last insured.  (R. 302.)  The claimant's attorney added that he and his client had tried to contact Dr. Boran, but were unable to do so; however, Dr. Shehi went through Dr. Boran's records. *Id.*

The ALJ next questioned Dr. Susan Heape, the vocational expert.  (R. 302-05.)  Dr. Heape testified that the claimant had worked as a sewing machine operator, and that such "work is light to medium physical demands, semi-skilled, [and] not transferable to other kinds of work." (R. 303.)  Dr. Heape also testified that "barely within the relevant time period [the claimant] worked as a certified nursing assistant," and that such "work is at least medium ranging to heavy, depending on the mobility of the patient, . . . [and is] also semi-skilled, not transferable [to other kinds of work]."  *Id.*  Additionally, Dr. Heape testified that the claimant "performed these jobs as they are customarily performed in the national economy."  *Id.*

The ALJ then asked questions based on two hypothetical situations involving an "individual of the claimant's age, education and vocational background."  *Id.*.  The first situation imagined an individual "capable of lifting objects weighing up to 20 pounds, [who] could sit for as much as six out of eight hours per day and [could] stand and walk for as much as four out of eight hours per day, but would require a sit/stand option."  (R. 304.)  The individual "would also

be limited to work that is low stress in nature . . . [and] would deal primarily with objects and not people." *Id.* Such work would require only brief, infrequent and casual contact with the general public and coworkers, and "not require the satisfaction of production quotas, nor require the operation of a motor vehicle, nor require an individual to work around unprotected heights." *Id.* Dr. Heape testified that the hypothetical individual would not "be capable of performing any of the claimant's past work as a sewing machine operator," but that other jobs existed that such an individual could perform. *Id.* Dr. Heape testified that such an individual could work as an inspector, assembler, or hand packager, and that 7,000, 11,000, and 14,000 jobs existed in Alabama, respectively. (R. 304-05.)

The second hypothetical situation imagined an individual "limited as set forth by Dr. Shehi in Exhibit 9F." (R. 305.) Dr. Heape testified that such an individual would not be able to perform any of the climant's past or any other work because Dr. Shehi "cited marked levels of impairment in areas which would preclude attention, concentration, adequate persistence, pace, adequate getting along with others and responding to customary work pressures." *Id.* Dr. Heape testified that "[s]omeone would not be able to work if they are limited as he's described." *Id.* Additionally, Dr. Heape testified that if the ALJ "should find the claimant's testimony to be fully credible and supported by the record as a whole," the claimant would not be able to return to her past work or perform any other work. *Id.* Dr. Heape based his opinion on the testimony of the claimant that "she wants to run away if she has to face crowds, that she can't stand for long because of her legs, [and] that she fatigued easily because of her lungs." *Id.* Dr. Heape concluded that, based on the claimant's testimony, the claimant is "never alone or only briefly alone, relies on others for her independent living skills, . . . is not able to function independently

13

and . . . would not be a reliable worker." *Id.*

*The ALJ's Decision*

On November 21, 2007, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 24.)  First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset date. (R. 19).  The claimant did have some earnings from 2002, but the ALJ found that these earnings were "insufficient to show substantial gainful activity."  *Id.*

Second, the ALJ found that the claimant was impaired by "panic disorder NOS, generalized anxiety disorder, . . . history of pulmonary embolism, hypothyroidism, and history of depression."  *Id.*  The ALJ found that the record supported a determination that, since the claimant's alleged onset date, she had been diagnosed and treated for depression, panic disorder NOS, generalized anxiety disorder, and hypothyroidism.  *Id.*   The ALJ found that the medical records supported a determination that from the claimant's alleged onset date of disability until her date last insured, her "mental symptoms were at most moderate in intensity and were regulated by medication."  *Id.*  While acknowledging that the claimant experienced a period of severe mental symptoms prior to the onset date of disability, the ALJ found that "after obtaining regular treatment, including medication, her symptoms were regularly reported to be moderate in intensity" and medical records indicated that on may occasions, she was doing very well. *Id.*  The ALJ then found that in 2005 and 2006, which was after her last insured date,  medical notes indicated that the claimant's "condition fluctuated."  (R. 20.)

Third, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

14

Subpart P, Appendix 1, because the claimant's impairments have "not been shown to impose limitations as mentioned in the listings." *Id.* The ALJ found that the "claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing." *Id.* To reach his determination, the ALJ found that the "paragraph B" criteria were not met because he found that the claimant had only moderate restrictions in each area and "ha[d] experienced no episodes of decompensation," despite the opinions of Dr. Shehi. *Id.* The ALJ also found that the evidence failed to establish the presence of the "paragraph C" criteria. (R. 21.)   Fourth, the ALJ found that "the claimant has the residual functional capacity to lift 29 pounds, sit for 6 hours in an 8 hour day, stand and walk for 4 hours in an 8 hour day with a sit stand option." *Id.* Additionally, the ALJ found that the claimant "should work mainly with objects and not people," that she should have only brief, infrequent, and casual contact with the general public and co-workers. *Id.* The ALJ also found that the claimant "should have no production quotas or complex job tasks, no operating dangerous machinery, and [have] no work around unprotected heights." *Id.*

In making this determination, the ALJ considered the medical records, opinion evidence and claimant's subjective testimony to which the ALJ applied the pain standard *Id.* While "the claimant alleged that she was disabled prior to her date last insured," the ALJ found that her medical records did not support that allegation. (R. 22)  Additionally, the ALJ found that the claimant's "medical treatment records show[ed] only that the claimant had some limitations during [that] time, but none more than . . . moderate in severity." *Id.* The ALJ found as relevant Dr. Shehi's 2006 Medical Source Statement specifically stating that he lacked knowledge whether the claimant had been disabled prior to her last insured date; Dr. Shehi did not treat the

claimant until 2006.   The ALJ acknowledged the statement in Dr. Shehi's subsequent February

2007 letter that the claimant received repeated medical excuses from work in 2001 and that her

condition worsened each time she attempted to work or undergo vocational training.   However,

the ALJ found that the medical records did not support Dr. Shehi's statement about her condition

worsening with work attempts.[1]   The ALJ found that the medical records did not reflect any

significant, persistent side effects from her medications and that "nothing in the medical

evidence of record shows that from her alleged onset date . . . [to] her date last insured, the

claimant was disabled due to her impairments," (R. 22, 199, 260.)

The ALJ concluded that the claimant's medically determinable impairments could

reasonably be expected to produce the claimant's alleged symptoms of anxiety, but that the

claimant's statements concerning the intensity, persistence and limited effects of her mental

problems were not entirely credible.  (R. 22, 305.)  Regarding Dr. Shehi, the ALJ gave little

weight to his opinions because Dr. Shehi was not the claimant's treating physician prior to her

date last insured; instead Dr. Boran, a colleague of Dr. Shehi, was the claimant's treating

physician during this period.  (R. 23.)  Additionally, the ALJ found that Dr. Shehi's opinion in

the February 2007 letter, discussing the claimant's history when Dr. Boran was treating her, was

---

[1]One sentence in the ALJ's opinion does not make sense in light of the surrounding discussion and the cited record.  After stating that the medical records did not support Dr. Shehi's opinion that claimant's condition worsened with work attempts, the ALJ next wrote: "Indeed, her treatment notes do show reflect a worsening or her condition due to attempted work or training, but do show that when taken off of some of her medication, she had to be placed on it again due to temporarily worsening symptoms." (R. 22).  The record cited, at least during the relevant time period of 2002-2004, appears to support that sentence with the addition of the word "not" in the first clause: "Indeed, her treatment notes do *not* reflect a worsening on [sic] her condition. . . ." (R. 248-57).  Given the use of "but" to connect the clauses, the court assumes the omission of the word "not" to be a typographical error; the import of the sentence is clear.

16

"not supported by the great weight of the medical evidence of record." *Id.*

Further, the ALJ found that, based on the opinion of the vocational expert, the claimant was unable to perform any past relevant work, but that a significant number of jobs were available in the national economy that the claimant could perform. *Id.*

## VI. DISCUSSION

Claimant asserts the ALJ erred in rejecting her hearing testimony that she suffered from disabling mental illness from January 31, 2002 through the present. She argues that her medical records confirm a longitudinal medical history for disabling mental impairments and further, that the ALJ improperly evaluated that supportive medical evidence and improperly rejected the opinion of Dr. Shehi. The Commissioner argues, on the other hand, that substantial evidence supports the ALJ's opinion, and that the ALJ properly refused to accord significant weight to Dr. Shehi's opinion.

Because much of the argument focuses on Dr. Shehi's opinion and the propriety of the ALJ's rejection of that opinion, the court will first address that issue. The ALJ ultimately gave little weight to the portion of Dr. Shehi's opinion addressing the claimant's condition from the alleged onset date to the date last insured. Initially, the court must determine whether Claimant properly characterized Dr. Shehi as a treating physician. If he is, then well-established Eleventh Circuit law requires the ALJ to give his opinions substantial weight, absent a showing of good cause for failing to do so. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986) (*per curiam*).

To succeed in her application for disability benefits, claimant must prove that she was disabled as of the last insured date, September 30, 2004. During the period at issue immediately

17

prior to the alleged onset of disability date - January 31, 2002, through the date last insured -

September 30, 2004, Dr. Boran was claimant's treating psychiatrist at Mountain View Hospital

and not Dr. Shehi; however, Dr. Boran has left Mountain View Hospital, is no longer practicing

in the area, and claimant was not able to procure a statement from her. Because her treating

physician during the relevant period was unavailable, the claimant obtained a Medical Source

Opinion from Dr. Shehi, who is head of the behavioral center at Mountain View and who has

access to Dr. Boran's records, but who personally only saw her twice, in July and September of

2006.

The Social Security regulations define a non-treating physician as one "who has

examined you but does not have, or did not have, an ongoing treatment relationship with you."

20 C.F.R. § 404.1502. The regulations define a treating physician as

> your own physician, psychologist, or other acceptable medical source who
> provides you, or has provided you, with medical treatment or evaluation and
> who has, or has had, an ongoing treatment relationship with you. Generally,
> we will consider that you have an ongoing treatment relationship with an
> acceptable medical source when the medical evidence establishes that you see,
> or have seen, the source with a frequency consistent with accepted medical
> practice for the type of treatment and/or evaluation required for your medical
> condition(s).

20 C.F.R. § 404.1502.

The court recognizes the claimant's disadvantage in this case because of Dr. Boran's

unavailability. However, the ALJ did not err in refusing to accord controlling weight to Dr.

Shehi's opinion. Dr. Boran – not Dr. Shehi – was claimant's treating physician during the

relevant period. The record reflects only two visits with Dr. Shehi. Those visits occurred in

2006, two years after her last date of insured, during an interim period between treating physician

18

Boran and treating physician Spaulding. The court finds that those two visits in 2006 do not establish an ongoing treatment relationship nor did they establish that he provided treatment "with a frequency consistent with accepted medical practice" for mental health treatment during the relevant period of 2002-2004. 20 C.F.R. § 404.1502; *see Heppell-Libsansky v. Comm'r of Soc. Sec.*, 170 Fed. App'x 693, 698 (11th Cir. 2006) (finding that the ALJ did not err in refusing to accord controlling weight to physician who saw the claimant only twice in the relevant period and thus, did not have a longstanding relationship or provide frequent treatment during that period). The record does not reflect that Dr. Shehi was more knowledgeable about the claimant's condition over the relevant period than other non-treating physicians reviewing the same records. *See Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983) (finding that the ALJ properly discounted the opinion of a physician where claimant had seen him only twice and where the record did not show that the physician knew more about the claimant's condition than other doctors during the period at issue). Therefore, the ALJ was not required to accord controlling weight to Dr. Shehi's opinion, and his failure to do so does not represent error. Alternatively, the court finds that the ALJ showed good cause for his rejection of the crucial portion of Dr. Shehi's opinion, as discussed below.

The second issue concerns the ALJ's application of the pain standard to claimant's subjective testimony about her inability to work during the relevant 2002-2004 time frame. In evaluating pain and other subjective complaints, the ALJ must consider whether the claimant demonstrated an underlying medical condition, and *either*

> (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain.

19

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added).  Claimant argues that the ALJ erred in finding that Dr. Shehi's opinion failed to provide objective medical support for the claimant's testimony about her inability to work during that time frame.  As the ALJ correctly pointed out in his Medical Source Opinion, Dr. Shehi declined to opine whether the claimant was disabled because of psychiatric problems prior to her last insured date in September of 2004, saying he did not have enough information to do so.   Because that opinion does not provide the requisite support, claimant's arguments focus on Dr. Shehi's February 2007 letter, sent after the Medical Source Opinion.  In that letter, Dr. Shehi acknowledged that claimant had received medical excuses from work because of her psychiatric conditions and other medical complications.  He further noted that claimant had received treatment for her mental impairments at Mountain View Hospital since 2001 and "[t]hroughout treatment patient showed periods of moderate improvement, yet anytime during treatment that patient attempted to pursue gainful work or pursue vocational rehabilitation, her condition worsened."  (R. 281).

The ALJ accorded little weight to Dr. Shehi's opinion in his February 2007 letter, and as discussed previously, he was not required to assign controlling weight to it.  However, he was required to consider Dr. Shehi's medical opinion, and he did so, assigning a specific weight to it and explaining the reason for that weight.  The ALJ's explanation for his negative treatment of Dr. Shehi's February 2007 opinion was that, because Dr. Shehi was not treating the claimant during the 2002-2004 period, his opinion about her symptoms during that period was supposedly based on Mountain View Hospital medical records, but in fact, differed from those records.  The court will examine the medical records from this time period to see if they do indeed fail to

20

support Dr. Shehi's opinion.

Dr. Shehi's February 2007 opinion letter could be read as stating or implying that claimant had been unable to work during the entire period of her treatment at Mountain View Hospital, which began in 2001. To the extent that it so opines, this opinion would be inconsistent with Dr. Shehi's own Medical Source Opinion and objectionable from that point of view. In any event, Dr. Boran's records do not reflect that claimant received a medical excuse from work *during the relevant period*; rather, they state that claimant received a medical excuse from work from April 2002 through July 15, 2002, a four month period ending six months before the alleged onset date.

Dr. Shehi's opinion letter seems to claim that *throughout* the treatment period from 2001 to February 2007, the claimant had made unsuccessful attempts to work or to pursue vocational rehabilitation and that these activities had worsened her condition. The ALJ found that the records from the relevant time period do not support this statement, and the court agrees. The records from the time claimant quit her job in July 2001[2] through the end of 2004 do not document any failed attempts at work or vocational rehabilitation. Indeed, the only reference to work during that period is a positive one: Dr. Boran's March 1, 2002 treatment note indicates that the claimant was working in some capacity in a high school lunch room and specifically states that she was *enjoying* the work. The subsequent medical records are silent about work but certainly do not support any conclusion that this lunch room job or any other work attempts worsened claimant's condition. During the relevant time period, those reports document claimant's stable condition with references to claimant enjoying church activities and being part

---

[2] The therapist notes that claimant quit her job in July 2001 *before* returning to work.

of her teenaged daughter's life.  According to the medical records, the only worsening of her condition occurred not when she attempted to work but when she attempted to discontinue or decrease her usual dosage of Effexor.  Therefore, the court agrees that the Mountain View Hospital records do not support Dr. Shehi's February 2007 opinion to the extent that he states claimant's efforts to return to work during the relevant period caused her condition to worsen.  Thus, the ALJ considered and provided well-supported reasons for discounting the portion of Dr. Shehi's February 2007 opinion upon which the claimant relies heavily.

Absent that portion of his opinion, what remains is Dr. Shehi's statement that after reviewing Dr. Boran's 2001-2004 treatment notes, he does not have enough information to opine whether the claimant's mental condition rendered her disabled as of the last insured date.  His opinion corresponds with that of the DDS psychiatrist, Dr. Frank Nuckols, who similarly stated that he did not have enough information to rate the severity of claimant's mental condition as of the date last insured.  Because these opinions do not support or refute claimant's statement that her mental condition rendered her disabled from working during the relevant period, the ALJ looked to Dr. Boran's treatment notes to assess claimant's credibility.

As discussed previously, those notes do indicate that claimant experienced a period in late spring/early summer of 2001 when she was unable to work and received medical excuses from work.  However, Dr. Boran's medical treatment notes support the ALJ's opinion that this disability was temporary and when claimant received drug treatment with Effexor, she was able to improve and stabilize her mental condition within a few months.  Further, the notes support the ALJ's opinion regarding the lack of disabling side effects from Effexor; the records often specify that claimant was experiencing no side effects and occasionally reflect that the only side

effect she experienced was sweating.  Although the medical records indicate that claimant's condition may well have worsened years after her last insured date, the court must focus on the relevant period.  Thus, substantial evidence exists for the ALJ's finding that claimant's medical records during the period at issue do not support her testimony about the severity of her mental impairment during that same time frame.

### VII. CONCLUSION

For the reasons stated, this court concludes that substantial evidence supports the decision of the Commissioner, and therefore, finds that it is due to be  AFFIRMED.  The court will enter a separate order to that effect simultaneously with this Memorandum Opinion.

DONE and ORDERED this 30th day of March 2010.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE